# WYOMING INV. CO. v. WAX ET UX.

(No. 1770; Jan. 31, 1933; 18 Pac. (2d) 919)

(Rehearing denied June 13, 1933)

For the appellant there was a brief by *Charles E. Lane,* and oral arguments by *Mr. Lane* and by *W. O. Wilson,* of Cheyenne, Wyoming.

For the respondent there was a brief by *Lee & Lee,* of Cheyenne, Wyoming, and oral argument by *Ray E. Lee,* of Cheyenne, Wyoming.

324

BLUME, Justice.

This is an action brought by the plaintiffs, respondents herein, against the defendants, appellants herein, on a promissory note purporting to have been executed by the defendants on April 22, 1929, made to John W. Hartney for the principal sum of $1776.00, due on or before five years after date with interest at the rate of 7% per annum payable semi-annually, and providing that in case of suit upon the note the makers thereof should pay 10% additional as attorney fees. The note was secured by a mortgage also sought to be foreclosed herein, made to John W. Hartney, which also is dated on April 22, 1929, duly acknowledged before R. N. LaFontaine, Notary Public, and duly filed for record on May 9, 1929, conveying as security the west sixteen feet of the north forty-four feet of Lot 3 in Block 175 in the City of Cheyenne, Wyoming. The mortgage states that it is a second mortgage and that a first mortgage for the sum of $4000 is held by the Investors Snydicate of Minneapolis, Minnesota. It further provides that:

"In case default shall be made in the payment of the above sum hereby secured, or in the payment of the interest thereon, or any part of such principal or interest, when the same shall become due, or in case default shall be made in any of the covenants and agreements hereof, then the whole indebtedness hereby secured, with the interest thereon shall

become due and payable, and the mortgagee may proceed, pursuant to law, to foreclose on and sell said property, and out of the proceeds of such sale they shall pay all sums due hereunder, together with all costs of sale and foreclosure, including One Hundred Dollars as attorney's fee."

On May 14, 1929, the plaintiff and respondent herein, the Wyoming Investment Company, made a loan to John W. Hartney. The note of $1776 made by the defendants was pledged as collateral thereto, and endorsed to the plaintiff on the back thereof. At the same time John W. Hartney made and executed to the plaintiff an assignment of the Wax mortgage, duly acknowledged and filed of record on the 14th day of May, 1929, and on the same day John W. Hartney also executed to plaintiff an agreement showing that the note and mortgage heretofore mentioned had been duly assigned as collateral security, and that it should be security for the payment of all and any liabilities due or to become due to plaintiff or that might thereafter be contracted, and that the collateral, in case of default, might be sold at public or private sale without notice, with the right of the plaintiff to become purchaser at such sale. The officers of the plaintiff corporation testified that on May 15, 1929, the following letter was sent, duly stamped and addressed and deposited in the postoffice, as follows:

"Louis Wax & Anna Wax,
321 West 16th Street,
Cheyenne, Wyoming.
Dear Sir & Madam:
This will notify you that we have your note for $1776.00 dated April 22, 1929, payable to the order of John W. Hartney and secured by a certain real estate mortgage; this note has been pledged with us as security for a loan made to Mr. Hartney. This is to inform you that any payments made to apply on principal or interest on this loan must be made at our office."

The note heretofore mentioned, made by Hartney to plaintiff, dated May 14, 1929, is for the principal sum of

$1573.00, payable $50 on the third day of each succeeding month. Twenty payments were made, the last on January 3, 1931, making the total of payments on the note the sum of $1000, and showing the principal amount due thereon as of that date the sum of $573.00, but an additional loan seems to have been made to Hartney, the facts of which do not clearly appear in the record, evidenced by a note of October 7, 1930, for $352.50, payable at the rate of $27 on the third day of each month thereafter. On this last note no payments were ever made, and the note of $1573 was in default after February 3, 1931. In accordance with the power of sale conferred upon the plaintiff it advertised the Wax note and mortgage for sale, and a sale of the collateral pledged by Hartney to the plaintiff was accordingly made on March 12, 1931, to the plaintiff herein. It is alleged by the defendants that the sale was illegal, but no evidence to that effect was introduced. Prior to that time, and on February 14, 1931, plaintiff also advised the defendants by letter, as well as orally, that in view of the fact that no payments had ever been made on their note of $1776, the entire amount had become due, and requesting a settlement. Nothing being done by the defendants, this action was instituted on March 12, 1931.

The defendants pleaded that the note and mortgage in suit were never executed, or if executed were obtained from the defendants, who are illiterates, by fraud perpetrated by one R. L. LaFontaine, and that whatever paper was executed by them as requested by LaFontaine was represented by the latter to be a contract for the purchase of property. The origin of the indebtedness by the defendants herein appears to be as follows: On November 22, 1927, the Barksdale Realty Company, or John W. Hartney and R. L. LaFontaine, were the owners of the property mentioned in the mortgage in suit in this case. They had theretofore made a contract of sale for such property to F. M. Burrill. The latter desired to dispose of his interest, and Morris Wax, son of the defendants herein, desired to acquire a

home and to purchase that property. On November 22, accordingly, Burrill and his wife assigned the contract, which he held, in blank, in the presence of Morris Wax, of Max Wax, also a son of the defendants, and of Annie Wax, one of the defendants herein, paying Burrill the sum of $500 for his interest in the property, which sum was paid by Max Wax. The contract was payable at the rate of $50 each month and payments of that sum were continued to be made each month up to April 22, 1929. At that time, according to the plaintiff's theory, the Burrill contract was taken up by a note and mortgage of $4000 to the Investors Syndicate of Minneapolis, Minnesota, and by a note and a second mortgage against the property for $1776, the latter being the note and the mortgage in suit in this case. The defendants, however, deny that the Burrill contract was taken up by the notes and the mortgages just stated, but claim that it was intended at that time that a new contract of purchase should be made, and claim that if any new papers were executed, it was a new contract of purchase executed to them instead of to F. M. Burrill. No new contract of purchase was, however, actually executed, but payments made by the defendants or their sons each month thereafter were made to the Barksdale Realty Company, and consisted of the sum of $50.00. $40 of this was credited to the first mortgage in a loan book of the Investors Syndicate. All of these payments were also endorsed, at least up to March, 1930, on the Burrill contract. The amounts of $10 each month, that is to say, the amount over and above the $40 credited on the first mortgage, were never paid to the plaintiffs on the second mortgage, but were retained by the Barksdale Realty Company or by the stockholders thereof. It appears that R. L. LaFontaine and John W. Hartney were the only stockholders of the Barksdale Realty Company. That company became insolvent about the beginning of February, 1931, and Hartney ceased to make any payments on his note to plaintiff. These facts appear to have caused the latter to enter into direct and personal

negotiations with the defendants, finally precipitating the litigation herein.

Other facts will be mentioned herein and can be more conveniently stated in connection with the questions raised by the appellants herein. The trial court found generally in favor of the plaintiff and against the defendants, entered judgment against the defendants for the sum of $2396.52, and ordered foreclosure of the mortgage in suit. From the judgment so entered, the defendants have appealed. There are seventy-nine assignments of error. Most of them are not argued, and they are, accordingly, waived. There is attached to the brief a copy of the assignments of error, but we cannot regard that as the equivalent of an argument thereon. At the time of the oral hearing of this case in this court, the plaintiff tendered what is called a reply brief, but over objection, we refused to permit it to be filed, as coming too late, and new points therein argued will, accordingly, not be considered. Moreover, we have held that points not raised or argued in the main brief of appellants cannot be raised in a reply brief. In Re Demorest's Estate, 41 Wyo. 189, 283 Pac. 1097. We shall, accordingly, proceed to consider the assignments of error discussed in the main brief of the appellants, without, however, attempting to mention every statement made by counsel, since to do so would make this opinion of undue length. All the facts, however, argued in that brief have been given due consideration.

1. It is somewhat difficult to tell from the brief of the appellants herein just what is claimed. Many of the arguments and statements therein are directed to the fact as to whether or not the instruments in question were executed by the defendants—signed by them. It is pleaded in the second amended answer that when LaFontaine called to have the papers signed, he had them with him, already prepared and in his hands; and it is alleged "that they are the identical papers sued upon herein; that he

read, or rather misread or explained at length the contents of said papers to said illiterates * * * that because of the confidential relations * * * they signed said papers." Here the execution of the instruments in suit is specifically admitted, and hence, if this statement stood by itself, there would seem to be no room for any claim to the contrary. However, in a separate paragraph of the first defense in the second amended answer, defendants specifically denied the execution of the note in suit, and in the second defense of the same answer, defendants specifically denied the execution of the mortgage securing the note. This defense is, of course, wholly inconsistent with the admission heretofore mentioned. We held in Wyoming Constr. & Dev. Co. v. Lumber Co., 25 Wyo. 158, 166, 166 Pac. 391, that it is not permissible under Section 89-1015, Rev. St. 1931, to plead separate defenses in the same answer which are so inconsistent in fact that the proof of one would necessarily disprove the other, but that, if contradictory defenses are pleaded the remedy is by a motion to strike, or to require the defendant to elect upon which he will rely, and that in the absence of such motion, the objection is waived and both can stand. It was further said that the concessions of a defense by way of confession and avoidance to not obviate the necessity of proving the averments contradicted by the denial. It seems to be held that defenses, if inconsistent, should be stated separately. That was not done in the case at bar, so far as the admission of the execution of the note and the denial thereof are concerned. Still we shall, for the purposes of this opinion, assume that the cited case applies herein, and shall, accordingly, proceed to consider whether there is evidence to sustain the trial court in holding that the instruments in suit were executed by the defendants.

Much stress is laid by defendants upon the fact that the Burrill contract, and the property covered thereby, were

bought for, or for the benefit of, Morris Wax, and counsel want us, therefore, to draw the conclusion that it is unlikely that defendants executed the instruments in suit. While the foregoing fact is a circumstance to be taken into consideration, yet there are indications in the record that the purchase of the Burrill contract was more or less of a family affair. The $500 paid to Burrill was paid by Max Wax, a brother of Morris. The defendant Annie Wax was present at the time of the assignment of the Burrill contract. As pleaded by the defendant, and as seems to be conclusively shown by the testimony of Morris Wax, the assignment was in blank. Subsequently the names of Morris Wax and Annie Wax were inserted as the assignees. When that was done is not shown. There appears on the contract, which was introduced in evidence by defendants, the statement that "taxes for 1928 to be paid by Mrs. Wax." It seems to be claimed that this was secretly done, but there is no testimony to that effect. Again, the payments made on the contract seem to indicate that the transaction was more or less of a family affair. Louis Wax testified in part: "Q. Did you ever make any of these payments for Morris? A. No, really, I don't exactly pay for Morris, but we make up our checks before, and we pay them. Q. Who did you make out the checks for? A. I don't know, Morris took the checks. Q. But you did make out the checks? A. Yes, I made out the checks. Q. To make the payments on this property? A. Yes, a few of them." The receipts for the various payments of money, introduced in evidence by the defendants, show that most of the money was paid by Louis Wax, some of it by Morris Wax, some of it by Max Wax, and some of it by the defendant Annie Wax. Morris Wax testified that the payments were at times made by his father, sometimes by himself. It seems strange, unless the transaction was a sort of family transaction, and if Morris Wax only was directly involved, that he should

not have seen to it that the receipts for money paid were issued in his name. He himself stated: "I was always making payments on the house, and the contract there (the Burrill contract) wasn't signed in my folks' name or any of our names, and I kept asking Mr. LaFontaine for a brand new contract in our name." By "folks" he meant his parents, we think, for he never made any reference to his wife.

The witness LaFontaine testified that he told the defendants that it was necessary to sign the note along with the mortgage. Aside from that there is ample testimony in the record that Louis Wax signed both of the instruments in suit. The witness Cronland testified to that effect. The interest of Louis Wax in the transaction is also shown by his payments. Moreover, he signed his name on a sheet of paper introduced in evidence. The court doubtless compared that signature with those on the note and the mortgage, and found them to correspond.

Many arguments are advanced in connection with the signature of the defendant Annie Wax. It is argued that the Annie Wax whose name was inserted in the Burrill contract as assignee is the wife of Morris, whose name also seems to be that of Annie. But the latter appears nowhere in connection with the transactions in this case. It was the defendant Annie who, as already stated, was present at the time of the assignment of the contract. It is the defendant Annie, under the name of Mrs. Louis Wax, to whom one of the receipts of money on the contract was given. It is the defendant Annie, if any Annie at all, whose note and mortgage was taken. But attention is called to some peculiarities in the signature on the instruments. The defendant Annie Wax could not write. If she signed the documents, it was by a cross. The names of R. L. LaFontaine and F. A. Farnsworth appear as witnesses to her signature. And the words "Annie Wax Her Mark" are written opposite to the cross which appears on the in-

struments. The words ''Annie Wax'' are in a different ink from the name ''Louis Wax,'' and it is claimed that this is ground for suspicion. We think, however, that the court was authorized to find that it was written by R. L. LaFontaine, as it seems to be written with the same ink as that name. The words ''Her Mark'' may have been written by F. A. Farnsworth, though we are not sure. The name F. A. Farnsworth is in a different ink from that of LaFontaine's. These differences may have arisen by reason of the fact that Farnsworth and LaFontaine each had a different fountain pen with which they appended their names, and the other words of identification. These matters would seem to be of secondary consideration. The important thing is the cross, which, if made by Annie Wax, was or represented her signature, and that cross, so far as we can tell, and as the court, we think, was authorized to find, is in the identical ink, and appears to be of the same age as that with which the name Louis Wax appears to have been written. It was shown that the signature of Farnsworth, attached to the instruments, is genuine. But it is argued that he should have been produced as a witness, and that his non-appearance on the witness stand is a suspicious circumstance. We do not think that the trial court was bound to take that view. There was much said during the trial why Farnsworth was absent. We need not go into that. The court evidently accepted the explanation, and we think it was justified in doing so.

While the witness LaFontaine stated that because of so many transactions, he had no distinct recollection of this one, he also stated that Mrs. Wax must have signed the instruments in question, since he took the acknowledgment of the mortgage in question, and that he at no time made any statements to deceive the defendants. The denial of her signature by Mrs. Wax, taken as a whole, was weak at best. She specifically admitted that LaFon-

taine asked her to sign what she denominated as a large piece of paper, and further specifically admitted that she signed it. Her testimony, while contradictory, was, on direct examination, in part as follows: "Q. You thought there was only one paper that you signed? A. Just one paper. Q. But you might have signed more? A. I might." Here she specifically admitted that she signed the mortgage—for that was the only "large piece of paper" presented to her. And it is not likely, taking all of the circumstances of this case into consideration, that she was asked to sign that only and not the note. Furthermore, the witness Louis Wax testified that when Mr. LaFontaine came into the store he himself was busy, and that Mr. LaFontaine, accordingly, talked to his wife, and that he subsequently signed a paper which he said was a contract, but he said nothing whatever as to the signature of his wife, which itself would seem to be a damaging circumstance.

Taking all of these facts into consideration, it is difficult to see how it can be claimed that there is no substantial evidence in the record to sustain the holding of the trial court that the defendants executed the instruments involved in this suit. The fact, if it is a fact, that LaFontaine was not a competent notary public to take the acknowledgment on the mortgage would seem to be unimportant. If the defendants actually signed the mortgage, no strength would be given to it, as between the parties, by an acknowledgment thereof. It would be good between the parties without such acknowledgment. Boswell v. Bank, 16 Wyo. 161, 182, 92 Pac. 625, 629; Conradt v. Lepper, 13 Wyo. 473, 485, 81 Pac. 307, 308; Harney Adm'r v. Montgomery, 29 Wyo. 362, 381, 213 Pac. 378. And the transferee of that mortgage would be at least in as good a position as the transferor. Of course, if the note and mortgage were procured by fraud, that would make them voidable, at least between the parties thereto,

but that is a question entirely apart from that of the execution of the instruments, and will be considered next in order.

2. Counsel for plaintiff have argued this case mainly on the theory that it could not be affected by any claim of fraud made herein on the ground that it is a holder in due course. It may be that the evidence of the facts and circumstances herein under which plaintiff took the instruments was sufficient to show plaintiff to be such holder. See Glendo State Bank v. Abbott, 30 Wyo. 98, 216 Pac. 700. But the note was acquired only as a pledge, and is not in the same situation as a note of which the absolute ownership is acquired, and if the note was actually tainted with fraud, as claimed, plaintiff, though a holder in due course, should not have been permitted to recover more than the principal amount which was due to it from Hartney. Sec. 74-204, R. S. 1931; 49 C. J. 1031-1032. It could not, we take it, by the mere sale of the pledge, and thereby becoming absolute owner of the note, enlarge its rights against the defendants beyond those which existed at the time that such sale was made. But the recovery herein was larger than the amount due from Hartney, and that would be justified only on the theory that the note was not voidable on the ground argued herein. Hence it becomes important to determine whether the court was justified in finding, as it must have found, that the defense of fraud interposed by the defendants was not well grounded. We might say in this connection that this defense (as well as that of the execution of the papers) was put directly in issue by the pleadings, and there is nothing whatever to indicate that the court did not determine it, finding in favor of plaintiff. Hence, if the court's finding on that point is sustained by substantial evidence, the further point whether or not plaintiff was the holder in due course, would, of course, be of little, if of any, importance. There are, it is true, circumstances in this case,

which give color to the claim of defendants. The fact, for instance, that Mrs. Wax could not read or write and that Louis Wax was to a more or less extent illiterate, was to be taken into consideration. But there is no evidence that they lacked experience in business, and there are indications that the contrary was true. Again, there is the fact that the Burrill contract was bought for the benefit of Morris Wax. But we have already explained that point. Again it appears that while a deed to the property covered by the contract was made to Annie Wax, and was duly filed of record, there is no specific testimony to the effect that either of the defendants received notice of the execution of that deed. The defendants testified that they knew nothing about it. But we cannot say that the court was compelled to believe them, in view of other testimony which they gave. They stated, for instance, or tried to give the impression, that they signed only one paper. The court found their testimony to be untrue on that point, and doubtless took that into consideration in determining the question of fraud. Moreover, this matter had at best but an indirect bearing on the point now before us. Again, it appears that the payments which were made by the defendants or their sons, namely, the sum of $50 each month, continued to be endorsed on the Burrill contract. That, of course, was not consistent with the elimination of that contract, and the substitution of notes and mortgages therefor. But neither is it consistent with the claim of the defendants that they believed that, when they signed the note and mortgage in suit, they were signing a new contract of purchase. Part of these payments, namely, $40 each month, were credited on the first mortgage and entered in a loan book of the Investors Syndicate, which book was in the possession of the Barksdale Realty Company. The note or mortgage given to Hartney was not in its possession, and it is possible that the endorsements continued to be made

on the Burrill contract for that reason, though, of course, that was not a good one, and the $10 out of each $50 should have been turned over to plaintiff, which was not done. The point here mentioned might be of greater importance than it seemingly deserves, if any real motive for fraud existed. But so far as we can tell, no such motive existed. In any event, we are not the triors of the facts herein, or the judges of the credibility of the witnesses, and after a painstaking consideration of all the evidence in this case, we do not think that we are warranted in holding that the trial court's finding was not sustained by substantial testimony. We shall mention the main reasons. In the first place, the witness LaFontaine specifically stated that he made no statements at the time of the execution of the instruments in question to mislead the defendants. Whether or not that testimony was to be credited was, of course, within the province of the trial court. Again, the fact that the defendants denied having signed the note and mortgage, when, on the contrary, the court found the contrary to be true, and other circumstances in the case, some of which will hereafter be mentioned, doubtless caused the court to hesitate in believing the charge of fraud. This is particularly and noticeably true in connection with the testimony of Louis Wax, who claimed that he signed only one paper, namely, a contract, when there was ample and independent testimony, evidently credited by the court, that he signed both the note and the mortgage. And in this connection we should bear in mind that the note, which is of small dimensions, could not well be taken for a contract of purchase, which the defendants executed, and which Mrs. Wax denominated as a large piece of paper. Further, the note and mortgage in question constituted in fact "a new contract," which Morris Wax testified he had requested. There was no particular reason to get a new contract similar to the Burrill contract, since the assignment made thereon vested the

rights thereunder in the Wax family just as effectively as a new one could have done. It is said that the Burrill contract was old and worn, and that a new contract of purchase was requested for that reason. But we do not think that the trial court was bound to accept that explanation. There is evidence in the record that on April 22, 1929, "new contracts" were made all around; that on that day the Burrill contract was eliminated, and that in its place a first mortgage for $4000 on the property was executed to the Investors Snydicate, and a note of $1776, secured by a second mortgage on the same property, was executed to Hartney. There is no claim that the combined indebtedness covered by the first and second mortgages exceeded the amount then due under the Burrill contract. Hence there was apparently a total absence of motive for the committment of any fraud on the part of LaFontaine, a fact of considerable importance herein in determining whether or not the claim of the defendants is based on facts. It is true that they did not sign the Burrill contract, and they were not, therefore, personally liable thereon. But even according to their own testimony, particularly that of Louis Wax, they were perfectly willing, by signing a new contract, to enter into a personal obligation for the amount due thereunder. Mr. LaFontaine testified that the transactions herein involved could not have "been handled in any other way." He did not explain his reasons. But we can readily conjecture what they were. The record shows that Chas. J. Ohnhaus had a mortgage on the property involved in this case for the sum of $4000, dated April 19, 1926. This mortgage was released on April 25, 1929, three days after the note and mortgage involved in this suit were executed. It probably was due three years after date, and it was necessary to make arrangements either for the renewal thereof, or to give a mortgage of $4000 to some one else. Both the Barksdale Realty Company, as well as the defendants,

were interested in not having the Ohnhaus mortgage foreclosed. A new mortgage could not properly be executed without taking into consideration the rights of the holders of the equitable title under the contract of purchase, and hence the parties did what would seem not to be inconsistent with the natural thing to do under like circumstances—the legal title was vested in one of the persons holding the equitable title, so that a new mortgage could be executed. So the mortgage to Ohnhaus was simply replaced by the mortgage given to the Investors Syndicate. The payments on the latter were apparently to be made monthly. A loan book of that company was introduced by the defendants. It shows the loan to be in the name of Louis Wax, husband of Annie, and further shows monthly credits of $40 per month. Morris Wax testified that on March 25, 1931, he gave a check, seemingly all in his handwriting, direct to the Investors Syndicate for $40 "in full payment of installments due to date." That shows not only a recognition of the "new contracts" of April 22, 1929, but also shows the fact that the transactions in question were more or less of a family affair, for, as stated, the loan book of the Investors Syndicate was in the name of Louis Wax. Morris Wax, of course, could not bind the defendants by his acts, unless he was duly authorized. But the relationship between him and his parents in connection with the transactions herein has already been mentioned, and there is other and further evidence in the record to a similar effect, and we are not prepared to hold that the trial court was not authorized to find that whatever he did, he did with his parents' consent. And finally the testimony shows that on May 15, 1929, only a few days after the purported execution of the note and mortgage in question, both the defendants were advised of the existence of the instruments in suit by letter, duly mailed and stamped. No objections were made thereto for two years. The credi-

bility of the witnesses testifying to the sending of this letter and of those denying the receipt thereof, was within the province of the trial court. And if this letter was in fact received, and the trial court had the right to draw that inference, then, of course, there is little, if anything, left for the defendants on which to base their claim of fraud.

3. Much is said in the brief of counsel for the defendants as to the ownership of the instruments in suit, and the right of plaintiff to sue thereon. It appears that LaFontaine had, at least originally, an interest therein, and counsel for the defendants attempted to show that Hartney took the note surreptitiously out of the property jointly owned by him and LaFontaine. The court inquired for what purpose such evidence was offered, and counsel who represented the defendants in the trial below answered, apparently, that it was offered to show the fraud claimed to have been perpetrated on the defendants. We cannot see how it could have a tendency to do so. Defendants, of course, had a right to insist that the action should be brought by the proper party in interest, so as to be protected against a second suit. Counsel, apparently, did not have that in mind. But we shall assume the contrary and discuss the point with that in view. The court sustained an objection to the question put to the witness LaFontaine whether he ever consented to Hartney taking the Wax note and mortgage and pledging it. It may be that in connection with other evidence, the question was proper, to show that plaintiff's possession of the instruments in suit was in bad faith. See Hay v. Hudson, 31 Wyo. 150, 162, 224 Pac. 840. But when the objection was sustained no offer was made to prove the facts which the question assumed. No error, accordingly, can be predicated on the ruling of the court. Casper Motor Company v. Marquis, 31 Wyo. 115, 223 Pac. 764; Chicago & N. W. Ry. Co. v. Ott, 33 Wyo. 200, 237 Pac. 238.

The note and mortgage were given to Hartney with the specific consent of LaFontaine, for the acknowledgment of the mortgage was taken before the latter as notary public. The mortgage was placed of record, and these records, accordingly, which were examined by the plaintiff, gave every indication that Hartney alone was the owner of the note and mortgage, and that LaFontaine had no interest in it. Counsel for defendants attempt to draw the contrary conclusion, but we think that is clearly wrong.

The testimony also shows that plaintiff's secretary told LaFontaine immediately after the transfer by Hartney that plaintiff had acquired the note and mortgage in suit. Furthermore, LaFontaine was a witness in this case, made no claim to any interest in the note and mortgage, and stood by and permitted plaintiff to recover. These facts clearly warranted the trial court in finding that plaintiff was not prevented by any interest of LaFontaine from prosecuting this action.

The note was duly endorsed by the payee thereof; it came into plaintiff's possession, and was by it produced at the trial and introduced in evidence. The mortgage, also made to Hartney, was duly assigned to plaintiff, by an assignment duly acknowledged, and duly made a matter of record. And while plaintiff originally was the pledgee, the pleadings and evidence tend to show that thereafter, by sale of the pledge, the plaintiff became absolute owner of the instruments in suit. We think, accordingly, that there was ample evidence to warrant the trial court in holding that the plaintiff was such owner and was entitled to sue thereon. 8 C. J. 1003. See also Hay v. Hudson, supra; McDonald v. Mulkey, 32 Wyo. 144, 231 Pac. 662; Stockgrowers Nat. Bank v. Crosby, 39 Wyo. 454, 273 Pac. 679.

4. It is admitted that the sum of $210 was paid by the defendants at the office of the Barksdale Realty Company, which should have been credited on the note in suit. All these payments were made prior to March 12, 1931, the date when the plaintiff became the absolute owner of the instru-

ments in question. Before that time plaintiff was but the pledgee thereof. And the point is, whether or not the defendants should have credit for this amount. We think they should, in view of the fact that on that date there was at best not more than $1085 due from Hartney, according to the plaintiff's testimony, and defendants claim that it was less. We are unable to see upon what principle of law or equity the plaintiff should be able to recover this $210, which would have been a legitimate set-off in a suit between the original parties to the note. Clearly, if credit for that amount were disallowed, the plaintiff would be enriched to that extent without any cause whatever. Peterson v. Rochelle, (Tex. Civ. App.) 287 S. W. 1105; Morrison v. Bank, 19 Ga. App. 343, 91 S. E. 509; Robertson v. McKibben, 20 Misc. 658, 46 N. Y. S. 380; Fifty-third National Bank v. McCrory, 191 Mo. App. 295, 177 S. W. 1058; Hayden v. Nicolletti, 18 Nev. 290, 3 Pac. 473; Cincinnati Second Nat. Bank v. Hemingway, 34 O. S. 381. In fact, counsel for plaintiff stated, at the time of the oral argument herein, that they had no objection to the allowance of this credit.

5. On the other hand, the defendants claim that the plaintiff should not have been permitted to have recovered a greater amount than that due to it from Hartney, and that this amount was less than $1085. We are cited to the general rule already referred to above and stated in 49 C. J. 1031, namely, that where the obligor proves a defense good as against the pledgor, the pledgee will be allowed to recover only to the extent of the debt for which he holds the collateral as security. We have no fault to find with that rule, but it is applicable in this case only in connection with the $210 already mentioned. If it had been shown, and the court had held that the note and mortgage in this case had been procured by fraud, the rule would undoubtedly apply with full force. But, as already stated, the court did not so find, but held the note and the mortgage valid. The instruments were endorsed, and were in the possession of the

pledgee, and he had the right to sue thereon. 21 R. C. L. 669. In Haas v. Bank of Commerce, 41 Nebr. 754, the court said:

"It is quite well; settled that where a note is valid as between the original parties, the pledgee may recover the whole amount of the note, retaining any surplus as trustee for the party beneficially entitled."

See also 21 R. C. L. 670, and cases cited. And in Barmby v. Wolfe, 44 Nebr. 77, 62 N. W. 318, the court said:

"It is only where the plaintiff prevails merely because he is an innocent holder that he recovers simply the amount of the pledge. Where he recovers because a defense against the original payee is not established he recovers the amount of the note." (pledged as collateral).

The same general thought is expressed in Germania Life Insurance Company v. Kohler, 59 Ill. App. 592, where it is said that if a note is held in due course by a pledgee, the same defense may be interposed to the amount over and above that which is due on the note of the pledgor, as if the note given in pledge had not been assigned. In other words, if the defense against the collateral goes to the whole of the indebtedness thereby represented, then, if it is sustained, the pledgee can in no event recover more than the amount due him from the pledgor; but if the defense is only partial, as that of partial payment, then there is no particular reason for holding that it should be permitted to go beyond that point in a suit by the pledgee. But be that as it may, the plaintiffs in this case became the absolute owner of the instruments in suit on March 12th, 1931, before the commencement of this action. The plaintiff thereby acquired rights at least as great as those which the original payee had. 8 C. J. 387. Even if we assume that the defense of non-execution and the defense of fraud were available to the defendants against them to the full extent, yet these defenses were not sustained. And the only other defense

which the defendants had was that of partial payment. If the note is valid, the defendants should, of course, pay it, and pay it to the owner, subject to whatever partial payments should be credited thereon. Hence we find no merit in the contention now under consideration. In this connection we might mention the fact that defendants claim that the note given by Hartney to plaintiff is usurious. We are unable to see how plaintiffs can take advantage of that, if true. The defense of usury is personal to the borrower. Reading v. Weston, 7 Conn. 409; Loomis v. Eaton, 32 Conn. 550; The Continental Credit Company v. Ely, 91 Conn. 553, 100 Atl. 434; Union Nat. Bank v. Bank, 123 Ill. 510, 14 N. E. 359, 39 Cyc. 999. We cannot see why the liability of defendants to the plaintiff as owner of the note in suit should be reduced by reason of the usury claimed to exist.

6. Counsel for the defendants claim that by reason of the payment of $210 heretofore mentioned, the same should be held to apply on the interest; that up to October 22nd, 1930, there was due on interest, according to the terms of the note, only the sum of $186.48; that another installment of $62.16 was not due until April 22, 1931, more than a month after the commencement of this action; that, therefore, this action has been prematurely commenced and defendants were not in default on the note. These facts were pleaded for the first time in the second amended petition, filed six months after the commencement of the action. The answer and amended answer only contained allegations that the contract of purchase was not in default. The evidence does not sustain this defense. The only thing that it shows is that the sum of $210 was paid at the office of The Barksdale Realty Company, and that it was credited on the Burrill contract. The note, it is true, was payable at the office mentioned. But it is held that making a note payable at a particular place does not make the person in charge thereof the agent of the holder to receive payment, unless he has actual possession thereof, which he did not have in the case at bar. 8 C. J. 601. And if a note has been pledged as col-

lateral, payment may and should be made to the person who holds it as such. 8 C. J. 601. That is true even in the case of a non-negotiable instrument after notice of the transfer has been given. 8 C. J. 600. And there is evidence in this case that such notice was given. Furthermore, it is held in Detwilder v. Heckenlaible, 63 Kans. 627, 66 Pac. 653, that where, as in the case at bar, a note secured by a mortgage which is executed in due form to entitle it to be made of record, and which is duly recorded, the payor of the note secured by such mortgage must take notice of such assignment, whether the note is negotiable or non-negotiable, and that any payment made by him on such note to the original payee or his agent thereafter is at the risk of the payor. Legally speaking, then, no interest on the note was paid to the holder thereof, and the note in suit was in default long before the commencement of this suit. If, then, the defendants are to be relieved from that default it can only be on equitable grounds. No cases have been cited to us which would permit or require that, and we have been unable to see how we could do so without inflicting injustice upon the plaintiffs, since the result would be that the benefit of two years' litigation would be lost. The position that plaintiffs paid interest preventing default is wholly inconsistent with their claim that the instruments in suit were not executed by them, or are void. They say on the one hand, in a part of their pleading, that they paid interest; they say and in fact insist, on the other hand, and testified, that they paid no interest, but simply paid money on the Burrill contract, or a substitute contract. On the trial of the case, they offered to fulfill the Burrill contract, according to the terms thereof; they made no offer to pay interest on the note according to its terms, or cure the default which in any event occurred on April 22, 1931. Varis v. Ferrell, 57 Ind. App. 1, 101 N. E. 122. Counsel for the defendants say that "if plaintiff had not been so greedy, and would have gone to the Waxes and demanded the actual balance due it, in order to buy peace, they would probably have paid it, and then

fought the matter out with Hartney.'' It may be conceded that plaintiff, to show its high sense of ethics, ought to have made such offer. But we are not at all sure that the result would have been as counsel claim. It is clear that when the agents of plaintiff went to talk to defendants a month before the commencement of the action, defendants repudiated the note and mortgage in suit, a position entirely inconsistent with counsel's conjecture. We have no doubt that this repudiation had considerable influence in inducing the plaintiffs to commence this action and incur the expense thereof, which by this time is not a small item. The Barksdale Realty Company being insolvent, and Hartney in a precarious position, it was, in view of defendants' claim, important for the plaintiff to determine and determine promptly what, if any, security for its loan it had. And it has often been held that where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title or right, he cannot afterward assume a position inconsistent with such act, claim or conduct to the prejudice of another, who has acted in reliance on such conduct or representation. 21 C. J. 1202. It has also been held that a plea that an action has been prematurely commenced is not one in particular favor with the law. Seches v. Bard, (Cal.) 8 Pac. (2d) 835. The reason is that it is treated as a plea in abatement. Bohanan v. Bohanan, 150 Iowa 182, 129 N. W. 129; Rosser v. Insurance Co., 101 Ga. 716, 29 S. E. 286; Fjore v. Ladd, 29 Or. 528, 46 Pac. 144. And it is said that such plea is favored neither at common law, nor under the Codes. 1 C. J. 2. It is not jurisdictional and may be waived. 1 C. J. 1152. In Louisiana it is held that unless it is interposed at the very threshold of the action, it is waived. Hunter v. Laurent, 158 La. 874, 104 So. 747, 1 C. J. 1152, note 96. In Rosser v. Insurance Company, 101 Ga. 716, 29 S. E. 286, the court holds that if it is not set up during the first term of court after the commencement of the action, it comes too late. In Fjore v. Ladd, supra, it is said:

"The objection that an action is prematurely brought is a mere matter of abatement, and should be taken by demurrer if it so appears upon the face of the complaint, otherwise by answer before pleading to the merits, or it is waived."

See also 1 Ency. Pl. & Pr. 22, 32; Moore v. Sargent, 112 Ind. 484, 14 N. E. 466 (involving an acceleration clause similar to that involved in the case at bar); Railway Co. v. Stevenson, 6 Ind. App. 207, 33 N. E. 254. In a number of states a plea of abatement must be filed separately from that of a plea in bar, and the two pleas are sharply distinguished. We take it that under our statute, under which a defendant may set up as many defenses as he may have (Sec. 89-1015, R. S. 1931), it is permissible to file an answer setting forth both a plea in abatement as well as one in bar. 1 C. J. 29. At the same time the difference in the nature of the two pleas cannot be entirely overlooked and the case at bar clearly illustrates that it would have been of considerable advantage to the plaintiff, if the plea now under consideration had been interposed promptly, for in view of the fact that a default in the payment of interest occurred at least on April 22, 1931, it could, without great loss of time, have dismissed the action and immediately brought another. However, it is not necessary, we think, to determine whether the defendant waived the plea by not setting it up until after the answer and amended answer had been filed. It has been held that if a case is tried on the issue whether a contract was executed or not, it is then too late to claim that it was prematurely commenced. Welch v. Miller, 210 Pa. 204, 59 Atl. 1065; Benjamin v. Zell, 100 Pa. 33. That is, fundamentally, the situation here. For while the payment of interest was pleaded, as already stated, that defense was not sustained, and in fact no attempt to sustain it was made. The case was tried substantially only on the theory that the instruments in suit were not

executed, or if executed, were void. While, accordingly, we think that credit for the $210 should be given defendants, we are not persuaded, though the point is not free from doubt, that we should, under the circumstances of this case, hold that it should be given on the interest, so as to require the further holding that there was no default on the note and that the action was commenced prematurely.

7. The note in suit provides that "in case of suit upon this note, or if collected by an attorney with or without suit, I, we and each of us agree to pay ten per cent additional as attorney's fees." The mortgage in suit provides that in case of foreclosure, the mortgagors should pay an attorney fee of one hundred dollars. In the judgment below, plaintiff was allowed to recover both of these items, to-wit $100 for foreclosure of the mortgage, and the sum of $208 as attorney's fees provided in the note. This is assigned as error. The courts seem to be agreed that it is improper under any circumstances to allow a greater sum than that agreed to be paid. 8 C. J. 1101; 42 C. J. 340. But the stipulated amount may be excessive and need not always be paid. This court said in Graves v. Burch, 26 Wyo. 192, 200, 181 Pac. 354:

"But by the great weight of authority, a provision for attorney's fees in a note or mortgage is a contract of indemnity only—in the nature of a penalty as distinguished from liquidated damages—to compensate the payee or holder for an expense which he has necessarily incurred or became liable for, through some default of the maker or mortgagor; and such fees, even where there is a stipulation for the recovery of a certain or stated amount, are within the equitable control of the court, to allow only such sum as may be reasonable."

In Hamlin v. Rogers, 79 Ga. 581, 5 S. E. 125, and Montague v. Stelts, 37 S. C. 200, 15 S. E. 968, it is held that where different sums are specified as attorneys' fees in the mortgage and note, it is the contract expressed in the

note which governs. On the other hand, in Lewis v. Sutton, 21 Idaho 541, 122 Pac. 911, it is held that the fee provided for in the mortgage should govern. There is a statutory provision in that state to the effect that there can be but one action for the enforcement of any rights secured by a mortgage. In Hewitt v. Dean, 91 Cal. 5, 27 Pac. 423, under a similar statutory provision as in Idaho, it was held that where the note provides for recovery of five per cent attorney fee, and the mortgage for a reasonable compensation, no greater sum than that provided for in the note can be recovered. Similar in effect are Rockwell v. Thompson, 124 Wash. 176, 213 Pac. 922. In Potwin v. Blasher, 9 Wash. 460, 37 Pac. 710, the note provided for a reasonable attorney fee and the mortgage for a fee of five per cent. It was held that the attorney fee could not exceed that provided for in the mortgage. Thus it is seen that the decisions are not uniform, except in holding that no double compensation, stipulated in the note and mortgage in suit, can be recovered in any event, and the tendency, perhaps, is to limit the amount to the lowest one stipulated for, whether contained in the note or mortgage. In Graves v. Burch, supra, the note provided for an attorney fee of $100, and the mortgage for a like amount. The trial court allowed an attorney fee of $100, and even that amount was, for equitable reasons, disallowed in this court.

If, in the case at bar, the plaintiff had sued merely for the foreclosure of the mortgage in suit, and had not asked for a personal judgment, then no attorney fee could have been recovered in excess of the one hundred dollars provided for in the mortgage. For the mere asking of a personal judgment, accordingly, the plaintiff was allowed a further sum of $208, without any additional burden of proof or otherwise—at least so far as the record indicates. It would seem that a rule should be established that would be more just, or at least one lacking the anomaly just

indicated. We shall not attempt to establish a rule that might fit all cases. It would seem that in some cases, where efforts are necessary to be made aside from those involved in the foreclosure of a mortgage, an amount greater than that provided for in the mortgage would not be unjust, provided, of course, that the note, or other contract made between the parties, would permit it. Perhaps we could find an analogy in foreclosures by advertisement. It is clear that no recovery can be had in such case beyond that specified in the mortgage, if the indebtedness is thus satisfied. If a deficiency remains, and a personal action is then brought on the note for the recovery of the amount that remains due thereon, it is clear, we think, that the amount of an additional attorney fee, if any, would, ordinarily at least, be computed on, and largely governed by, the amount of the deficiency, that is to say, after the amount of indebtedness realized by the foreclosure has been deducted. We can see no good reason why the amount of attorneys' fees should, under the same contract, be larger in case the foreclosure is by action. Nor do we see why a practice may not be devised which in foreclosure actions would secure to attorneys a compensation equal to that which we have assumed—without definite decision—might be secured in the illustrated case of foreclosures by advertisement, and a suit for deficiency subsequent thereto. In the case at bar there is nothing to indicate that the debt of the defendants cannot be fully satisfied by the foreclosure of the mortgage, and therefore, no reason exists at this time for an allowance of an attorney fee beyond the amount specified in the mortgage. If it should appear that, after the mortgage is foreclosed and the property is sold, a deficiency remains, then only would the question arise whether or not an additional attorney fee should be allowed on the amount necessary to be satisfied by ordinary execution or otherwise. At the present time no such deficiency appears.

The judgment of the trial court must accordingly be modified by giving credit to the defendants for the sum of $210 above mentioned on the principal sum due, and it having been paid at various times, it should, to strike an average, be credited as of March 7, 1930, and the interest on the remainder adjusted accordingly. The sum due, then, on October 27, 1931, the date of judgment, without attorneys' fees, would be the sum of $1862.51, instead of the sum of $2088.52, as found by the court. The judgment should be further modified by allowing, at this time, an attorney fee of only $100, instead of the sum of $308, as found by the trial court. The total judgment should, accordingly, be reduced from the sum of $2396.52, found by the court, to the sum of $1962.51, as of the date of the judgment in the trial court. As thus modified the judgment is affirmed, the parties to pay their own costs in this court.

*Affirmed as Modified.*

KIMBALL, Ch. J., and RINER, J., concur.