ST. PAUL, J.
 

 Plaintiff! was a resident of the parish of St. John the Baptist, and pastor of a colored church congregation therein, and defendant was a deputy sheriff in the same parish.
 

 The defendant died after the filing 'of this suit, but before citation was served upon him, and his widow and heirs have been made parties defendant in his stead.
 

 I.
 

 The testimony is lengthy and rambling, and covers much of the political history of
 
 *877
 
 said parish for some 30 odd years before 1914, in the beginning of which plaintiff seems to have been of some political influence in the parish, and towards the end of which defendant had acquired some influence, and plaintiff had none.
 

 Of course none of this has any but the very
 
 remotest
 
 bearing on the issue of this case, which is an action for. damages for malicious prosecution and
 
 alleged
 
 false arrest. The purpose of it was to show that plaintiff had, or had not, a good reputation previous to the occurrences hereinafter mentioned. But the result of all that line of testimony is to show that plaintiff is neither the turbulent and persistent .lawbreaker that defendants seek to make him out, nor yet the very meek and altogether submissive peace lover that plaintiff would have us believe him. On the whole, plaintiff seems to have been simply an average good citizen with the average good reputation of such, and what is more to the purpose, his good reputation does not appear to have suffered any by reason of the said occurrences.
 

 II.
 

 The evidence, as we have said, is lengthy, and was taken at scattered intervals between July, 1915, when the suit was filed, and September, 1922, when it was disposed of in the court below, by reason whereof it is somewhat difficult to get into proper sequence the circumstances out of which grew the oeeurreiices herein complained of.
 

 On the other hand, the main facts are practically undisputed, being for the most part shown by documentary evidence.
 

 III.
 

 In February, 1908, defendant had sold to plaintiff’s wife a small tract of land in said parish, fronting half an arpent on the Mississippi river by four arpents in depth; on one (front) corner of which the aforesaid congregation had erected a small church. This building having been damaged by storm, and' the congregation having removed elsewhere, it was rented by plaintiff for commercial purposes to a certain partnership composed of one George Tregre and another.
 

 In March, 1914, and for some time prior thereto, defendant held a $250 mortgage on plaintiff’s wife’s property, and had been pressing for payment thereof. Plaintiff claims that defendant interfered with the sale thereof to some third person for more than defendant would give when he took it over in March, 1914, for $375, less the amount of his mortgage. And out of this arose, according to plaintiff, some feeling between them, to which feeling plaintiff attributes, an alleged enmity against him on the part of defendant, .which he assigns as the motive for the occurrences complained of. Defendant’s lips being sealed by death, we are, of course, without his version of the matter.
 

 IV.
 

 When defendant re-acquired the land aforesaid, the church
 
 building
 
 was excluded from the sale, but not
 
 the land
 
 on which it stood, and plaintiff continued legally to occupy towards the partnership the relation of lessor, especially since plaintiff had at once leased the land from defendant. Nevertheless the point is a
 
 fine one
 
 in law, and may not so readily be seen by the layman, and indubitably defendant was
 
 oumer of the land,
 
 though not of the building. And this may explain why defendant thought that plaintiff had “cheek” to demand rent of the partnership, and was “interfering with me (defendant) on
 
 my
 
 premises,” but will not
 
 excuse
 
 even though it may palliate defendant’s conduct in the matter to which we will now proceed.
 

 V.
 

 In June, 1914, the partnership was some six months behind in its rent, and plain
 
 *879
 
 tiff’s claim for same had been, placed for collection before a justice of the peace.
 

 On June 19th, defendant came to the barroom conducted by the partnership, and heard of plaintiff’s attempt to collect the claim; and then, as nearly as we can collect from the testimony of plaintiff himself and of his first witness, who alone testified as to the occurrence, this is about what took place:
 

 Defendant was standing on the barroom gallery, and plaintiff was walking in his garden, which was separated from the barroom premises by a fence some four or five feet high. Defendant called to plaintiff twice, but plaintiff did not answer. Defendant then said, “G— d— you; why don’t you answer?” Plaintiff then said, “Don’t you curse me,” and then jumped over the fence and walked toward defendant. Whereupon the dialogue proceeded about as follows:
 

 “Defendant: You have cheek to ask these people for rent.
 

 “Plaintiff: You attend to your business and let mine alone.
 

 “Defendant: That is my business.
 

 “Plaintiff: No it ain’t your business.
 

 “Defendant: What is my business?
 

 “Plaintiff: Your business as sheriff is to keep peace in the parish and not to break it.
 

 “Defendant: Yes? (Then, jumping off the gallery and mounting his horse:) I’m going to get a warrant, and want to find you when I come back.
 

 “Plaintiff: All right; I’ll be here.”
 

 This all occurred about 6 o’clock in the evening.
 

 According to plaintiff, each time defendant spoke he ended with “G— d— you”; but his witness testifies to the use of that curse only once.
 

 Be that as it mayi defendant thereupon went at once -before the justice of the peace and swore to a charge against plaintiff of
 
 “unlawfully and feloniously interfering tvith me (defendant) on my premises and acting
 
 saucy” (sic). '
 

 A warrant issued that same evening, but apparently was not placed at once in the hands of the constable. Defendant, however, sent for the constable, and upon his arrival asked to have plaintiff arrested. When the constable said he had no warrant, defendant said to him that it made no difference, and to arrest plaintiff anyhow. De-. fendant and the constable then went together to plaintiff’s house to arrest him, but being told by plaintiff’s wife that plaintiff was not at home, they gave it over for the time being.
 

 In point of fact plaintiff was at home, but very naturally did not care to spend the night in jail. But, knowing of the charge, plaintiff did not wait to be arrested, and voluntarily surrendered next morning to the sheriff himself (not to plaintiff, his deputy). He then accompanied the sheriff towards the courthouse, and, the warrant having been placed in the hands of the sheriff whilst they were on the way, plaintiff was p-laced in jail upon arrival, and remained there some 8 or 10 hours, until released on a small bond.
 

 VI.
 

 The request made by defendant to the constable to arrest plaintiff, even without a warrant, may and did show enmity on the part of defendant; and the fact that plaintiff was placed in jail for some hours as a result of an unfounded charge may and will be taken into consideration in estimating the damages to be allowed for a
 
 malicious prosecution.
 

 But to keep our jurisprudence straight, and not have this occurrence referred to as one example of a
 
 false arrest,
 
 we say that here there was no false arrest. True, when the circumstances are such as to render an arrest illegal without a warrant, neither a private person nor- an officer has a right to make an arrest unless he has the warrant with him at the time, even though
 
 *881
 
 a warrant has actually been issued, and the pferson arrested knows that it has been issued. 5 Corp. Jur. 391, § 14. But to constitute a false arrest there must first be an
 
 arrest,
 
 and here there was no arrest, for to constitute an arrest there must be an actual taking into custody, and the going in search of a person for the purpose of arresting him is not an arrest, if in fact such person is not taken into custody, nor yet 3s a voluntary surrender to an officer who holds no warrant an arrest. See Berry v. Bass, 157 La. 81, 102 So. 76, and authorities there cited. Plaintiff was therefore never under arrest until the sheriff obtained the warrant. But—
 

 “Although not always observed, the distinction between malicious prosecution and false imprisonment [or false arrest] is fundamental. But briefly, the essential difference between a wrongful detention for which malicious prosecution will lie, and one in which false imprisonment will lie, is that in the former the detention is malicious but under the due forms of law, whereas in the latter the detention is without color of legal authority.” 25 Corp. Jur. 444, 445, § 3.
 

 And this fundamental difference leads to very different results in these two ■ distinct species of torts, but we need pursue the subject no further in view of what we said at the opening of this paragraph.
 

 VII.
 

 When the charge aforesaid reached the district attorney, the latter considered it so frivolous (as indeed it was) that he paid no attention to it whatever, told plaintiff that he did not intend to proceed with the prosecution thereof, and did in fact file no information against plaintiff.
 

 Evidence of all this was admitted over the purely frivolous objection of defendant’s that this was “hearsay.” But no objection was made to said testimony, at that or any other time, that same did not show an actual termination of the prosecution favorable to plaintiff.
 

 However, when the case was closed, and the evidence failed to show that the district attorney had gone through the idle formality of filing an information and following it by a nolle prosequi (there being in fact nothing to nol. pros.), and on the very day the ease was finally submitted in the court below, defendants filed an exception' that “the petition and evidence taken shows no right or cause of action.”
 

 The exception is wholly without merit. Pretermitting the question whether the district attorney’s refusal to act did not of itself constitute a termination of the prosecution, nevertheless, the offense (if that term be at all appropriate) had long been prescribed under Rev. Stat. § 986 (amended by Act 73 of 1898, p. 96), when this testimony was given (December 20, 1921). Hence,
 
 the evidence
 
 shows that the prosecution had then terminated. For—
 

 “Any mode of termination is sufficient, which constitutes a bona fide and final disposition on the merits of the particular ease by the proper judicial officer or body, or which amounts to such a cessation of proceedings as to render them incapable of being revived.” 26 Cyc. 57.
 

 And at the very best the action was only premature, and exception thereto on that ground came too late after issue joined.
 

 In fine, “Interest reipublicse ut sit finis litiumand the only result of maintaining the exception at this time would be to require the suit to be filed anew. See Roehl’s Digest, vol. 2, p. 1348, No. 12, citing Jones v. Texas & Pacific R. Co., 125 La. 545, 51 So. 582, 136 Am. St. Rep. 339. See, also, Carnes v. Atkins Bros., 123 La. 26, 48 So. 572, and Vernon v. Illinois Central R. Co., 154 La. 370, 97 So. 493.
 

 VIII.
 

 We have so far confined ourselves to the charge of June 19th. In August follow
 
 *883
 
 ing, the aforesaid George Tregre and his partner had still paid no rent, and plaintiff demanded that they either pay the rent, or buy the building, or move out. They did neither. So, on August 7th, at about 8 o’clock in the morning, plaintiff procured a ladder, and going over to the building climbed upon the roof thereof and began unroofing it. Whereat Tregre protested, but took nothing by his protest. Thereupon he went to inform his partner, and get his advice as to what he should do. Whilst on his way to the landing where that partner ran a ferry, Tregre met the defendant, and told him what plaintiff was doing; and asked his advice. Defendant advised him that he should make a charge against plaintiff, but did not tell him what charge to make. Tregre then went to the justice of the peace, defendant not accompanying him. And before the justice of the peace and his clerk,
 
 Tregre
 
 swore to an affidavit charging that plaintiff
 
 “did willfully break and attempt in the nighttime to enter a building ■used as a barroom, and situated on the property of Emile Laurent-'’
 

 Upon this charge plaintiff was duly arrested and detained in jail some 8 days, when he was released on bond. And of course the grand jury returned “Not a true bill” when asked
 
 by the district attorney
 
 to indict plaintiff for “breaking and entering in the nighttime with burglarious intent.”
 

 But aside from the fact that,
 
 as deputy sheriff,
 
 he (properly) refused to release plaintiff until he had furnished a sufficient surety on the bail bond fixed by the justice, defendant had no other connection with this matter than to advise Tregre that he should make some charge,
 
 not this
 
 particular charge, ' against plaintiff. And defendant was not far wrong, if wrong at all, in believing that plaintiff had by his said conduct been guilty of a misdemeanor. Bee Rev. Stat. 1870, § 822 (amended by Act 197 of 1898, p. 448), and (Rev. Stat. § 827.
 

 Our conclusion is that defendant is not responsible in connection with this charge.
 

 IX.
 

 We think plaintiff is entitled to a judgment for $200 in connection with the charge of June 19, 1914, but to no more.
 

 He has prayed for “interest from judicial demand,” but this we cannot allow. These occurrences took place in 1914, and the suit was filed in 1915, but before 1916 interest on damages arising ex delicto could be allowed only from the date of the judgment liquidating said damages. Robertson v. Green, IS La. Ann. 28. And Act 206 of 1916, p. 459, providing that “legal interest shall, hereafter, attach from date of judicial demand, on all judgments, sounding in damages, ‘ex delicto,’ ” has been held not to be retroactive. Tortorice v. Yazoo & M. V. R. Co., 142 La. 230, 235, 76 So. 620.
 

 The judgment below was for defendant, and hence must be reversed and rendered in accordance with R. C. C. arts. 2086, 2087.
 

 Decree.
 

 The judgment appealed from is therefore reversed, and it is now ordered that there be judgment in favor of plaintiff, Adam J. Hunter, and against defendants, the widow and heirs of Emile Laurent (to wit, Mrs. Annette Becnel, widow of Emile Laurent, Lubin E. Laurent, Louis Laurent, Mrs. Sabine Laurent, wife of J. Ellis Millet, Mrs. Eabiola Laurent, wife of Claude Songy, and Miss Thelma Laurent, in the proportion of one-half against the first-named, and one-tenth against each of the five last named), for the full sum of $200, with legal interest from date hereof until paid.
 

 It is further ordered that plaintiff have judgment against all said defendants in solido for all costs of both courts.