**SCHNEIDER v. ROCKWELL–POWERS LUMBER CO., Inc., et al.**

**No. 60 Civ.**

District Court, W. D. Louisiana, Alexandria Division.

Nov. 20, 1940.

E. D. Adams, of Houston, Tex., and Cleveland Dear, of Alexandria, La. (Vinson, Elkins, Weems & Francis, of Houston, Tex., of counsel), for plaintiff.

LeDoux R. Provosty, of Alexandria, La., for defendants.

PORTERIE, District Judge.

The plaintiff, a resident of the city of Houston, state of Texas, sues the three defendants, citizens and residents of the Western District of Louisiana, in either one of two sums: (a) $7,500, representing a timber trespass on the lands of plaintiff in the quantity of 500,000 feet at $15 per thousand, or (b) in the sum of $12,500 for the same 500,000 feet at $25 per thousand; the variation being based upon whether the trespass on, or the taking of the timber off, the lands of plaintiff be in legal or in moral bad faith, respectively.

A plea of prescription was filed by the defendants. It was referred to the merits by the court and should be considered at this time. It is very clear from the evidence that the plaintiff never had a report of any timber depredation on his lands before receiving a letter, dated February 15, 1938, from one of the resident farmers near the timber tracts at issue. This letter disclosed the trespass, but did not give the name of the trespasser. It is only during the following month of June that the plaintiff actually went upon the property and saw that commercial logging had been done. This suit was filed on February 11, 1939.

The pertinent part of Article 3537 of the Louisiana Civil Code says: "The prescription mentioned in the preceding article runs: * * * And where land, timber or property has been injured, cut, damaged or destroyed from the date knowledge of such damage is received by the owner thereof."

Therefore, the plea of prescription falls; the suit is filed within the year. We are not impressed by the bare contention of defendants, unsupported by facts, that plaintiff had notice of any trespass other than by the letter of February 15, 1938.

We should now take the plea filed by the defendants on the point that this court is without jurisdiction because of the want of the necessary amount of $3,-000. The informant of plaintiff testified that he approximated the cutting over the lands of plaintiff, located in five sections, at 500,000 feet. The original letter sent to plaintiff is in the record and states moral bad faith. The rule in Louisiana in the case of moral bad faith in a timber trespass makes the value of the manufactured product without deducting the cost of manufacture the measure of damages. See State v. Williams Cypress Co., 131 La. 62, 58 So. 1033; Allen v. Frank Janes Co., 142 La. 1056, 78 So. 115; Gould v. Bebee, 134 La. 123, 63 So. 848; Rusca v. Boulet, La.App., 142 So. 319.

■ The record discloses that plaintiff ascertained the defendants to be trespassers in June, 1938. He employed a lawyer at the parish seat, who in turn employed two or three of the residents near the timber to go over the timbered sections and make investigation. These particular witnesses and a number of others have testified in the case. In view of the fact that suit had to be filed rather promptly to interrupt prescription, the court is satisfied that plaintiff's claim in the amounts alleged, both in the quantity of timber alleged to have been cut and the intent with which it was cut, was warranted by these facts and circumstances. With these two factors, quantity and price, as such, the claim readily reaches and well exceeds the amount for jurisdiction.

Again, we believe the plea attacking the jurisdiction not to be good, when renewed at the opening of the trial of the case, after plaintiff had reduced his claim for the timber cut as being in three sections instead of five sections. This case, after full trial, shows indisputably the manufactured value to be $21.51 per thousand, distributed as follows:

$ 3.33 Stumpage, average paid in neighborhood.
8.00 Logging and hauling to portable mill, paid to Foshee.
2.50 Hauling from portable mill to plant of company at Alexandria.
4.00 Rough dressing and drying at plant.
1.00 Handling, and other expenses at Alexandria plant.
2.68 Loss in footage—knots and other defects.

$21.51 Total manufactured value.

Plaintiff's estimator, taking the total depredation on the three part sections at 217,050 bd. ft., and assessing it at the manufactured value of $21.51 per thousand bd. ft., computes the damage to a sum of over $4,500.

■ There was placed at issue by the pleadings the question of title to the land in the plaintiff, so as to deprive him of any right to sue for the trespass. Documentary evidence is in the record supporting fully and legally the title to the lands in the plaintiff.

■ There is another point of contention which should be considered before the court reaches the real and final questions as to whether there was a trespass, then as to whether the defendants are the trespassers, then as to the intent of the commission of the trespass, whether in good faith, in legal bad faith or in moral bad faith; and, finally, the determination of the exact quantity taken. This point of contention is that since these lands at issue were adjudicated to the state by sheriff's sale on August 17, 1928, for the taxes of the year 1927, and were redeemed by the plaintiff on September 19, 1935, it follows, under the jurisprudence of Louisiana, that if the trespass be during the period these lands were owned by the state, plaintiff is without right to sue.

The undisputed proof is that George Foshee, one of the co-defendants, owned a portable sawmill and he began cutting in the neighborhood of plaintiff's lands in the late summer, probably in the early autumn, of the year 1935. His portable mill finally reached a location near the home of Archie Walker, from which point he then began logging in the general neighborhood during the spring or early summer of 1936. The commercial cutting on the lands of plaintiff was from the early spring to the late fall of 1936. This is supported generally by all the evidence, oral and documentary, and nothing is offered to refute it.

George Foshee admits having started commercial logging in the neighborhood on July 1, 1935, and having continued thereafter until August 19, 1936, moving his portable mill as convenience required. He states that he began cutting on Mr. Powell's tract, not at issue herein, on July 1, 1935. He then moved his mill to Cutt's place, adjoining the north of Section 23, in the "fall of 1935." By spring of 1936 the mill had been moved from Cutt's place to the front of the place of Archie Walker, one of the witnesses appearing in this case. Mr. Archie Walker is a storekeeper (stock of merchandise about $1,500), a life-long resident there, and of good reputation. The mill was actually on his property not far from the store. Right in front of Walker's place is Section 23. This places the mill in a ready position to saw the logs coming from the southern part of 23, whereon the most cutting occurred. This second location of the portable mill was nearer the southern section of 23 than the first location. The cutting on Sections 15 and 26 was after the cutting on Section 23. Therefore, the title of these

lands was not in the state during the period of cutting.

■ Mr. Archie Walker, Mr. James Monroe, Mr. James Monk, Mr. Clyde Nichols, and several others, all residents of the vicinity, testified that they saw and identified Foshee cutters in Section 23; that there were two cross-cut saws with two men to each saw; that the logs, after being felled, were loaded by teams on two trucks and then hauled to the mill. With this proof before the court—and we believe these witnesses—there can be no other conclusion but that the defendant, George Foshee, committed wilful trespass. Conclusively, he is shown to be in moral bad faith; he knew, or should have known, of these trespasses.

Moreover, this direct evidence stands not alone and unsupported. There is much supporting circumstantial evidence and we shall now review it.

The three part-sections in this suit form a part of the large area that was cut as virgin timber by the Calcasieu Lumber Co. some twenty years ago. This company did not use skidders at the time, but used teams to get its logs out. It is accepted universally that this latter method of exploitation leaves much sapling pine and permits such reforestation of pine in the period of twenty years as to warrant commercial logging, as occurred in this case. When the skidders are used, and not teams, there is such a full denudation that the coming back of the pine is made impossible.

Meandering through this southern section of 23 is a creek or bayou—a low strip —and in such low area were "some mighty good saw logs there." The proof is generally prevailing to the effect that there was cutting and logging by Foshee in the southern half of 23 intermittently for several weeks; there is proof in the record that ten thousand to twenty thousand feet were cut a day.

Proof is fully established on the point that the logs taken were ten feet in length or multiples thereof. Logs longer than ten feet were cut in multiples of ten at the mill and then sawn. The product was then manufactured by the defendant company at Alexandria into finished lumber and all sold as "car siding." Car siding is invariably in ten-foot lengths. The whole operation, evidently, from the standing tree in the woods to the finished product at Alexandria was with the view of producing car siding.

Since the extensive commercial logging of the Calcasieu Lumber Co., of some twenty years ago, the evidence is there has been none other except that by Foshee.

There are several items of proof that Foshee paid amicably through the period for logs that he cut supposedly by mistake on lands belonging to some of the small resident-owners.

Foshee had the right to log by contracts, all made of record, from some of the non-resident larger owners in that vicinity, to-wit: Ervine & Bishop, 12,500 acres; Mr. C. G. Hamill, San Antonio, Texas, 500 acres, actually cut, 100,000 feet; Long Bell Lumber Co., located in twenty-five sections, cut of over one million feet. He made smaller purchases, too, from about twenty owners.

Mr. Foshee stated categorically on the witness stand that he had no knowledge of the adjudication of the Schneider tracts for taxes to the state. The fact that lands go to the state for taxes is soon and generally known to the nearby residents, because the publication of the lands for sale is repeated for at least six weeks in the local parish paper, generally received by all rural residents. The knowledge of this fact by even only one of the residents is immediately passed by word of mouth to the neighbors. The fact of subsequent redemption by the former owner is not so readily known and spread; there is no newspaper publication of the fact; there is only a recordation of the certificate of of redemption in the alienation records. We fear very much, therefore, that Mr. Foshee considered these Schneider tracts of land as "public lands" from which depredations could be made on the theory that they belonged to everybody and not to anyone in particular.

The evidence shows that he cut, by right of contract with the Long Pine Lumber Company, on all four sides of the Schneider tract of forty acres in Section 15; likewise, he cut, by right of contract with Ervine & Bishop, on three sides (east, south and west) of the Schneider tract of a half section, being the southern half of 23; again, he cut, by right of contract with Ervine & Bishop and Clay Lyles, on the north, east and west of the Schneider tract of 120 acres in Section 26. Too, he had his mill located for a period on Cutt's place, near Section 23. We find him, therefore, near, and about, and all around,

these three sections, cutting commercial timber; no one else has been so found.

The record discloses very clearly that Mr. Foshee, before logging on the acreages that the corporation bought, had the corners well located and used a squad of three experienced people to blaze the lines from corner to corner. When his cutters are found beyond the lines, there is the presumption of a *wilful* trespass.

Charles Foshee, the brother of George, was the woods foreman in charge of all the logging. George admits, however, that he also visited the places of operation in the woods at least weekly. He is bound to have had an intimate knowledge of everything.

This recital covers substantially the main points of circumstantial evidence pointing to one of the defendants, George Foshee, as a wilful trespasser.

Now, having determined that George Foshee is liable in moral bad faith, we should determine whether or not the Rockwell-Powers Lumber Co., Inc., is also liable and whether or not Mr. Charles B. Rockwell, individually, is also liable, and then, if either or both be liable, whether or not the degree of liability is the same as the degree of liability of Mr. Foshee.

Mr. Charles B. Rockwell never went in person on the areas depredated, never visited even the milling operations of Foshee. The portable mill was owned entirely by Foshee. It appears that when Foshee would locate an owner of desired timber, he would approach Mr. Rockwell, as president and managing director of the Rockwell-Powers Lumber Co., Inc., to have the company purchase the timber. The Rockwell-Powers Lumber Co., after furnishing the money, had the title to the timber. Mr. Foshee, besides owning the portable mill, had his own teams and trucks. He employed the necessary laborers, felled the trees, logged them to the mill, cut them into boards for car-siding purposes, and delivery was then made of the lumber to the Rockwell-Powers Lumber Co. Mr. Foshee for this work was paid the fixed amount of $8 per thousand feet by the Rockwell-Powers Lumber Co. The company, and not Mr. Rockwell, made substantial loans in money to Mr. Foshee to enable him to buy operation units, when needed.

Mr. Charles B. Rockwell, individually, therefore, the court decides is not to be cast.

The corporation's knowledge is necessarily the knowledge of its officers, and since there is no evidence that any of the officers visited the lands while the timber was being cut, we believe the corporation to have been free of moral bad faith. However, the corporation received all of the lumber coming from the logs felled by Mr. Foshee on plaintiff's lands without having to pay for the stumpage cost. Foshee received the agreed payment per thousand feet for that which he located and sawed for delivery, whether it came from bought acreage or from acreage of plaintiff. The corporation was unjustly enriched as to plaintiff's lumber, and must pay for the stumpage cost. Interstate Tr. & Banking Co. v. Picard & Geismar, 147 La. 430, 85 So. 65.

We reach now the difficult problem for solution: the quantity of timber for which the defendants are liable.

How much logging was done is difficult to determine because the several witnesses giving direct evidence recount just what they saw from time to time; there was no close and continued watch by them of the cutting and hauling. Definite facts necessary to arrive at the exact quantity of trees felled by the defendants are not in the record; for that matter, are not possibly available, for these reasons among others:

(a) Open timbered lands owned by non-residents, without local surveillance, are considered a fair object for general depredation by a good portion of the local residents, if not for commercial purposes, at least for all local pioneer needs, such as posts for fencing, boards for barn, corncribs and garden lots, and wood for fuel. Also, depredations are common for small commercial purposes, such as for cordwood and for small lots of railroad ties for sale at the nearby town.

(b) When the land goes to the state for taxes, the above situation is aggravated and general; the commercial use becomes more pronounced, such as the logging of the instant case. The local theory is that the lands are public lands in the sense that they are for the general, open use of all.

(c) When the owner catches a trespasser, the tendency is to proceed from the particular to the general, and the trespasser is sued for all depredations for several years back and over the whole tract, taking in all co-depredation of any character, by any and all neighbors.

Important here, however, tending to reduce error, is the fact of there having been but one commercial operation in twenty years, and that by plaintiffs. Also—and this eliminates from consideration much of the depredation—this suit is only for the cutting of pine logs; there is no claim made for any hardwood of any kind; vicinal depredations for crossties, stave bolts, fence palings, fence posts, etc., would be of the hardwood, particularly of the oak, and not of the pine.

The timber estimator for the plaintiff makes the depredation (of course, only of pine) as follows:

| | | | | |
|---|---|---|---|---|
| Sec. 23 | — | 173,473 | bd. | ft. |
| " 26 | — | 17,439 | " | " |
| " 15 | — | 26,138 | " | " |
| Total | — | 217,050 | bd. | ft. |

The timber estimator for the defendants gives his estimate of the 1936 cutting in Section 23 and in Section 15, omitting Section 26, of pine logs, as 46,780 bd. ft.

In the same report and for the same year, the cut of pine trees for cross-tie purposes is placed at 12,561 bd. ft. It is proved that Mr. Foshee authorized the cutting of trees for cross-tie purposes in the wake of and following his commercial logging over these areas. Whether he received payment for this or not is immaterial. He had advanced himself in the neighborhood as the owner of this acreage and he did authorize the making of cross-ties. It might have been to secure good will generally, or cause the resident cross-tie makers to be participants with him. The court could add justifiably the two quantities of board measurement and cast the defendants for a cutting of 59,341 bd. ft. Nevertheless, this total approaches the final footage determined and assessed, thus becoming a supporting circumstance.

The estimator for plaintiff went into the area to make his estimate after the estimator for the defendant had been through, and he states that he failed to find markings on some of the stumps. He missed markings (a chunk or pine knot on the stump) in several of the low spots, where the timber growth was particularly good. This would explain but partly the discrepancy between the two estimates. They remain irreconcilable.

When a pine tree had been felled for the purpose of making cross-ties, piling, and perhaps posts and pickets, this fact remained ascertainable definitely even several years thereafter, because of the parings from the working of the tree left on the ground in a straight line from the stump to the top of the tree.

The estimate by plaintiff was made by taking the diameter of the log cut at the stump. It is claimed that since the logs were intended for car siding—and that is always in ten-foot length—the length was readily estimated upon mere sight, without actual measure, as to whether it was a ten-foot cut, a twenty-foot cut, or a thirty- or forty-foot cut—the latter being quite rare. This estimator did not measure the diameter of the top of the tree. He made a computation of each ten-foot cut, arriving at the diameter at large end of each ten-foot cut by a ratio which he developed by experiment on a number of trees before he began his estimate. In other words, at the beginning he did measure on five or ten trees the diameter of the top, which gave him the ratio of increase in diameter as you move from top diameter to the stump diameter. In that way he established, in the opinion of the court, a rather fair and accurate diameter for the large end of each ten-foot cut.

The estimate for the defendants was based altogether on the measurement of the diameter at the top of the tree, the small end of the log cut. His computation as to board measure was then made as of one log, measured at the small end, whether it be ten, twenty or thirty feet long. The prevailing custom in the scaling of logs is to measure at the small end.

It was proved, through cross-examination of the timber estimator of defendants, that scaling in ten-foot cuts would bring an increase in the board measurement. The logs longer than ten feet were cut into ten-foot lengths before being sawn at the mill. Consequently, the scaling in ten-foot lengths is more fair and reasonable.

The difficulty encountered from other factors in determining the exact—even the closely approximate—quantity of timber taken by the defendants is so great, that whatever small difference might arise through the two methods of log scaling is a minor one, relatively. It remains only as a circumstance among others.

The court realizes fully and well how difficult it is to tell to the year when a log was felled by the appearance of the stump

and the top of the tree. The timber estimator for the defendants testifies that "it would be hard to get at an estimate of anything from after the time the tops and stumps have lain in the woods five or six years." Mr. George Foshee, in giving his estimate of commercial saw logs cut during the period involved in this suit, on the south half of Section 23 and the northwest quarter of 'the northeast quarter of Section 15, gives it as 46,780 feet. An examination of the condensed report of the defendants' timber estimator for Section 23 made for the period of ten years 1930–1939, as to pine saw logs, gives 26,454 bd. ft. for 1934, 20,222 bd. ft. for 1935, and 5,241 bd. ft. for 1936; a total of 51,917 bd. ft. This cluster of three years represents the heavy and main cutting done during the ten years. This is brought out when we note how much less, relatively, the cutting was before and after the cluster of three years; for 1933 it was only 414 bd. ft. and for 1937 it was only 1,255 bd. ft. Since there was but one commercial log cutting in twenty years, and that unquestionably in 1936, and since, upon defendants' estimator's statement, the fixing of the cutting to the exact year is impossible, we must assume that these three cuttings, so comparatively large, were really in the year 1936, though set out by the estimator over a period of three years.

The ten-year report of defendants' estimator similarly made as to Section 15, by the same reasoning comes to the same conclusion. In the cluster of three years 1934–1935–1936, we find the report to show 4,429 bd. ft., 1,095 bd. ft. and 5,905 bd. ft., respectively; a total of 11,429 bd. ft. The year ahead of the cluster, 1933, shows only 122 bd. ft.; the year following the cluster of three years, 1938 (1937 omitted), is only 484 bd. ft.

On the other hand, the estimate for the plaintiff, unsupported in detail either orally or by written report, reaches the high climax for the three part sections involved of 217,050 bd. ft. This is to compare to 63,346, the sum of the estimates on the three part sections during the three years, from defendants' estimate.

The quantity of timber produced on the adjoining, and in some cases adjacent, tracts of timber should be of great probative value. All of these lands were cut of their virgin timber at the same time, about twenty years ago, and under one common ownership, using the same method of exploitation. Later, as this case develops, all the timber was bought by the Rockwell-Powers Lumber Co., the logging and hauling then followed, and all of it was done by Foshee at the same portable mill and as one continuous operation. This evidence, placed in the record by the defendants, is decidedly helpful. It shows that the production on the Long Bell Lumber Co. lands, ten sections, averaged 70,476 bd. ft.; on the Long Pine lands, six sections, averaged 31,899 bd. ft.; and on the Ervine and Bishop lands, ten sections, averaged 21,153 bd. ft.—the average of the total twenty-six sections is 42,603 bd. ft. per section.

The sum of the acreage of the three part sections of plaintiff's lands is 480 acres, less than a full section. It just could not be that 217,000 bd. ft. were on plaintiff's lands, especially when one considers that these larger holdings were under surveillance while plaintiff's lands did not have that benefit.

From this number of conflicting sources, none of which alone may be taken as indubitable to determine the quantity of cutting, the court, using all the varied data already quoted at length, believes that the fixing of the cutting at 50,000 bd. ft. represents a fair and reasonable assessment, supported by a preponderance of the evidence.

We have in the record payments for stumpage, as follows: for a few isolated trees nearly out of reach of the mill, a price of $2 per thousand was paid; for the bulk of the stumpage, representing small resident owners and some of the larger holders, a price of $4 per thousand; in the case of the Long Pine Lumber Company, a price of $5 per thousand. The court will allow $4 for the stumpage in this case.

Having placed defendant Foshee in moral bad faith, the assessment against him is clearly $8.00 per thousand (the manufactured value of the lumber after being sawn at his mill) over and above the stumpage cost, as he is burdened with the stumpage cost in the part of the judgment wherein the Rockwell-Powers Lumber Company is solidarily cast with him.

Accordingly, judgment will be signed in this case upon presentation, as follows: In the sum of $200 against the Rockwell-Powers Lumber Company and George Foshee, and for costs of this suit, in solido, Taylor v. Conway, Man.Unrep. Cas. 193; City of New Orleans v. Wagga-

man, Man.Unrep.Cas. 354; Hunter v. Laurent, 158 La. 874, 104 So. 747; and in the additional sum of $400 against George Foshee; both of these amounts to bear interest at rate of five per centum per annum from date of judicial demand until paid.